# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF ARKANSAS

| | |
|---|---|
| ANGELA LAUDERDALE, INDIVIDUALLY, AND AS REPRESENTATIVE OF THE ESTATE OF ADDISON COOK, DECEASED | Case No. _____ |
| Plaintiffs, | JURY TRIAL DEMANDED |
| vs. | |
| ORGANON USA, INC., MERCK & CO. INC., AND MERCK SHARP & DOHME CORP. | |
| Defendants. | |

## PLAINTIFFS' ORIGINAL COMPLAINT

By: /s/ *Shawn B Daniels*
Shawn B. Daniels
Arkansas Bar No. 99126
shawn@danielsfirm.com
**DANIELS LAW FIRM, PLLC**
129 West Sunbridge Drive
Fayetteville, Arkansas 72703
Phone: 479.521.7000
Fax: 479.437.2007

And

Connor G. Sheehan*
Texas Bar No. 24046827
csheehan@dunnsheehan.com
**DUNN SHEEHAN LLP**
3400 Carlisle Street, Suite 200
Dallas, Texas 75204
Phone: 214.866.0077
Fax: 214.866.0070

*Pro Hac Vice Application Forthcoming*

**ATTORNEYS FOR PLAINTIFFS**

## TABLE OF CONTENTS

I.    PARTIES ............................................................................................................. 3

II.   JURISDICTION AND VENUE ........................................................................... 3

III.  FACTS ............................................................................................................... 4

    A.   Overview of the Case ................................................................................ 4

    B.   Defendants' Misleading Marketing Campaign .......................................... 6

    C.   The Plaintiffs ............................................................................................ 6

    D.   Laws Governing the Approval and Labeling of Prescription Drugs............... 8

    E.   Summary Regulatory History of Nexplanon .................................................. 11

    F.   Nexplanon's Increased Risk of VTE and Death in Obese Women............................... 12

    G.   Nexplanon's Increased Risk of VTE in African-Americans ........................... 13

    H.   Defendants' First and Second Generation Contraceptive Products and the Known Risks of VTE ................................................................................. 14

    I.   Defendants' U.S. Nexplanon Label................................................................ 17

    J.   New Safety Information ................................................................................ 20

      (i)   Undisclosed Cases of VTE, Strokes and Cardiovascular Events from Clinical Trials 21

      (ii)  Undisclosed Safety Data from the Scientific Literature................................ 22

      (iii) Undisclosed Adverse Events and Safety Signal Analysis............................. 24

    K.   Summary of Defendants' Concealment of New Safety Information ............................. 25

    J.   Ms. Cook's Prescribing Physician Relied on Defendants' False and Misleading Safety Information ................................................................................. 27

IV.   CAUSES OF ACTION ................................................................................... 30

    COUNT I - STRICT PRODUCTS LIABILITY/FAILURE TO WARN .............................. 30

    COUNT II – FRAUD AND FRAUDULENT INDUCEMENT................................ 32

    COUNT III - NEGLIGENCE .......................................................................... 36

    COUNT IV - GROSS NEGLIGENCE ............................................................. 39

    PRAYER FOR RELIEF .................................................................................. 41

Plaintiff Angela Lauderdale, individually, and as representative of the estate of her deceased daughter, Addison Cook (referred to collectively in those dual capacities as "Plaintiffs") file this Original Complaint against Organon USA, Inc., Merck & Co. Inc., and Merck Sharp & Dohme Corp. (collectively, "Defendants").[1]

## I.      PARTIES

1.      Plaintiffs are residents and citizens of Washington County, Arkansas.

2.      Defendant Organon USA, Inc. ("Organon") is a New Jersey corporation with its principal place of business at 56 Livingston Ave., Roseland, New Jersey, 07068.

3.      Defendant Merck & Co. Inc. is a New Jersey corporation with its principal place of business at One Merck Drive, Whitehouse Station, New Jersey 08889.

4.      Defendant Merck Sharp & Dohme Corp. (collectively with Merck & Co. Inc., "Merck") is a New Jersey corporation with its principal place of business at One Merck Drive, Whitehouse Station, New Jersey 08889.

## II.      JURISDICTION AND VENUE

5.      This Court has subject matter jurisdiction over this lawsuit pursuant to 28 U.S.C. §1332 because there is diversity of citizenship between the parties and the amount in controversy exceeds $75,000. The Court has jurisdiction over Defendants because they engaged in business in this Judicial District and the State of Arkansas in connection with the transactions and occurrences giving rise to this action, and because the wrongful conduct alleged herein was directed at, took place in, and/or had foreseeable injurious effects in this Judicial District and the State of Arkansas. The Court also has jurisdiction over Defendants because they have continuously and

---

[1] Angela Lauderdale was appointed as Special Administrator of the Estate of Addison Cook on October 20, 2021, in the Circuit Court of Washington County, Arkansas, Case No. 72PR-21-962.

systematically engaged in business in this Judicial District and the State of Arkansas such that they have subjected themselves to personal jurisdiction in this Court for all purposes.

6.      Venue is proper pursuant to 28 U.S.C. §1391(b)(2) and (c)(1) because Plaintiffs' claims arose from events taking place within this Judicial District and Plaintiffs reside and were injured in this district.

## III.    FACTS

### A.    Overview of the Case

7.      This personal injury case arises from the wrongful death of 19-year-old Addison Cook, who suffered a fatal venous thromboembolic event (VTE) due to her use of Defendants' contraceptive drug implant, Nexplanon.

8.      Nexplanon is a progestin-only contraceptive implant.  It is a newer patent-protected version of Defendants' Implanon contraceptive implant, which lost patent protection and therefore much of its profitability in 2012. Like its predecessor, Nexplanon is a matchstick-sized contraceptive that is implanted beneath the skin of a woman's inner-upper arm and slowly releases small amounts of etonogestrel, a synthetic type of the female hormone progestin.

9.      Ms. Cook's death and, consequently, this case involve critical safety warnings that are entirely absent from the Nexplanon U.S. product label. Specifically, there is no warning in Defendants' U.S. Nexplanon label i) for the increased risk of VTE in obese women such as Ms. Cook; ii) for the increased risk of VTE in African-Americans such as Ms. Cook; or iii) any incidence data that would allow U.S. prescribing physicians to place the increased risk of VTE in context when assessing the risk-benefit profile of Nexplanon against safer contraceptive drugs. In foreign countries – in stark contrast to their watered-down U.S. Nexplanon label – Defendants warn foreign regulators and prescribing physicians about these risks.

10.     "There is an inherent tension between the desire for profit and scientific decisions that suggest warnings may well shrink the customer base because of the cautionary tone struck by the warnings."[2] That tension is evident here. Nexplanon is Defendants' flagship contraceptive product and one of the most heavily-marketed and profitable drugs in Defendants' history. As a direct result of their unprecedented direct-to-consumer and prescribing physician advertising campaigns,[3] Defendants have reaped many billions of dollars in sales from Nexplanon since it came on the market one decade ago.

11.     VTE and the multi-fold increased risk of VTE to obese woman and African Americans is a serious health concern and a leading cause of death. It is the type of risk that a reasonably prudent drug company should prominently warn for in its drug label. Defendants have the historical scientific knowledge, financial resources, and internal safety processes and procedures in place to warn about the very risks that caused Ms. Cook's death. Tellingly, Defendants' predecessor contraceptive drug products – containing the same active ingredient, etonogestroel – have contained stronger warnings regarding the risk of VTE for decades. The end result of Defendants' conscious decision to withhold critical safety information from the U.S. Nexplanon label is that their heavily-marketed, U.S. patent-protected, flagship contraceptive product label misleads U.S. doctors and U.S. patients about the drug's safety profile, resulting in more physicians prescribing the drug, more consumers requesting and using the drug, and more money in Defendants' pockets.

---

[2] *Hodges v. Pfizer, Inc.*, No. 14-cv-4855, 2016 WL 1222229, at *3 (D. Minn. Mar. 28, 2016).
[3] Between 2011-2018, Defendants spent hundreds of millions of dollars on Nexplanon advertising and marketing. Defendants spent nearly $100 million dollars on Nexplanon advertising in 2019 alone. *See* Wu, et al., "Trends in direct-to-consumer advertising of prescription contraceptives", Contraception, 93(5):398-405 (2016); https://advertisers.mediaradar.com/nexplanon-advertising-profile.

B.     **Defendants' Misleading Marketing Campaign**

12.     Defendants' unprecedented Nexplanon marketing campaign was unquestionably effective.[4] Since 2011, total Nexplanon sales have exceeded $5 billion. A substantial portion of Defendants' marketing spend targeted single 18 to 24-year-old females[5] such as Ms. Cook – and that targeted marketing strategy worked. Between 2011-2013, the use of Nexplanon by young women exploded. And the drug became particularly popular with women ages 15-24.[6]

13.     Defendants' marketing initiatives focused on images of attractive, fit and healthy women. Noticeably absent from these ads was any appreciable disclosure of the increased risk of injury or death from VTE to African-American or obese women such as Ms. Cook. Even though Ms. Cook's high-risk subpopulations comprised a substantial part of their target market, Defendants' Nexplanon advertising campaign failed to disclose these risks to these vulnerable people or their prescribing physicians. Unfortunately, Defendants' aggressive and misleading Nexplanon marketing campaign had catastrophic repercussions for those at-risk U.S. consumers and their families.

C.     **The Plaintiffs**

14.     At the time of her death, Ms. Cook was a 19-year-old African-American high school senior with a medical history of severe morbid obesity. She was a member of the National Honor Society, an Honor Roll student, the People Section Editor for the yearbook staff at Springdale Har-Ber High School, and had active plans to be the first member of her family to

---

[4] Starting in 2011 with the approval of Nexplanon, Defendants recorded blockbuster sales with total revenues of $294 million in 2011; $348 million in 2012; $403 million in 2013; $502 million in 2014; $588 million in 2015; $606 million in 2016; $686 million in 2017; $703 million in 2018; $787 million in 2019; and $680 million in 2020 during a worldwide COVID pandemic.  *See* Merck SEC filings 10-K (2011-2021).

[5] For example, Defendants used popular actresses Mandy Moore and Vanessa Hudgens as part of their  contraception awareness campaign.

[6] Daniels, et al., "Current contraceptive status among women aged 15–44: United States, 2011–2013," NCHS Data Brief No. 173, 1-8 (2014).

attend college. On February 25, 2019, she sought gynecological care at Parkhill Clinic for Women in Fayetteville, Arkansas and was evaluated by Dr. Linda Seale. At this visit, Ms. Cook reported that she had not used pharmaceutical contraception in the past and inquired about Nexplanon. At a follow up visit to Parkhill Clinic on March 21, 2019, Ms. Cook was assigned to Dr. Jason Hurt, who prescribed and implanted Nexplanon into her arm that same day. At the time, Ms. Cook was only 18 years old.[7]

15.    On December 6, 2019, Ms. Cook presented to Washington Regional Medical Center emergency department in Fayetteville complaining of chest pain and shortness of breath. Dr. Robby Guinn noted that Ms. Cook had a birth control implant placed in March; she was tachycardic and hypoxic; her labs and arterial blood gas were abnormal; and her lab test indicated the presence of a blood clot. A CT scan of her chest reflected bilateral multiple pulmonary emboli with right lower lobe infarct and right ventricular strain.

16.    Ms. Cook was diagnosed with pulmonary embolism and infarction, acute cor pulmonale (a form of acute right heart failure) and acute hypoxemic respiratory failure. She was admitted to Washington Regional Medical Center for further treatment.

17.    During her admission at Washington Regional Medical Center, Ms. Cook's condition seemed to improve and she was discharged on December 10, 2019. Three days later, she was rushed by ambulance back to Washington Regional Medical Center with renewed complaints of shortness of breath, low oxygen saturation and nausea. She was immediately admitted to the Intensive Care Unit, at which time her critical care physicians consulted her gynecologist regarding removal of her Nexplanon implant. Dr. James Gorman from Parkhill Women's Clinic recommended removal of the Nexplanon implant following Ms. Cook's

---

[7] The Food, Drug and Cosmetic Act includes 18-year-old Ms. Cook in the pediatric population.

discharge from the hospital. Unfortunately, Ms. Cook never left the ICU. On the morning of December 17, 2019, Ms. Cook suffered cardiac arrest, was intubated, and subjected to nearly an hour of unsuccessful advanced cardiac life support efforts.

18.     On December 17, 2019, 19-year-old Addison Cook died as result of a VTE event from Nexplanon.

19.     Ms. Cook's mother, Angela Lauderdale, is a 20-year employee of Tyson Foods. She raised Addison as a single mom and cared for Addison at the hospital as she fought for and ultimately lost her life. On behalf of the estate of her deceased daughter and individually, Plaintiff Lauderdale brings the claims below.

### D.     Laws Governing the Approval and Labeling of Prescription Drugs

20.     The facts and allegations set forth above must be viewed through the regulatory framework and heightened duties of care imposed on drug makers. The Federal Food, Drug, and Cosmetic Act ("FDCA" or the "Act") requires manufacturers that develop a new drug product to file a New Drug Application ("NDA") in order to obtain approval from the Food and Drug Administration ("FDA") before selling the drug in interstate commerce. 21 U.S.C. §355.

21.     A New Drug Application ("NDA") is the formal step a drug sponsor takes to request that the FDA consider approving a new drug for marketing in the United States. 21 C.F.R §314.50. An NDA should include all animal and human data and analyses of the data, as well as information about how the drug behaves (pharmacokinetics and pharmacodynamics) in the body and how it is manufactured.  21 C.F.R §314.50. A key component of the new drug approval process is the evaluation of the information regarding the safety and efficacy of the proposed drug. *Id.* Thus, the NDA must contain a section reporting on foreign or domestic clinical data regarding the proposed new drug.  21 C.F.R §314.50(d)(5).

22.     The application must also contain a description and analysis of all controlled or uncontrolled clinical studies relied on in evaluating the safety and efficacy of the drug. 21 C.F.R. §314.50(d)(5)(ii). The NDA should also include "a description of any other data or information relevant to an evaluation of the safety and effectiveness of the drug obtained or otherwise received by the applicant from any source, foreign or domestic, including commercial marketing experience, reports in the scientific literature, and unpublished scientific papers." 21 C.F.R. §314.50(d)(5)(iv).

23.     These FDA regulations in the premarketing phase require the drug sponsor to submit all safety information through the IND or NDA regardless of the source.[8] Changes in foreign labeling should also be disclosed in the IND or NDA filings.  *Id.*

24.     Manufacturers with an approved NDA must review all adverse drug experience information obtained by or otherwise received by them from any source, including but not limited to post-marketing experience, reports in the scientific literature, and unpublished scientific papers. 21 C.F.R. §314.80(b).

25.     Under what is known as the Changes Being Effected ("CBE") regulation, a manufacturer with an approved NDA can make certain changes to its label without prior FDA approval by simply sending the FDA a "supplemental submission." 21 C.F.R. §314.70(c)(6)(iii).

26.     Changes to the labeling a manufacturer can make pursuant to CBE without prior FDA approval include those to "add or strengthen a contraindication, warning, precaution, or adverse reactions for which the evidence of causal association satisfies the standard for inclusion in the labeling under § 201.57(c) of this chapter" and "to add or strengthen an instruction about

---

[8] Good Review Practice: Clinical Review of Investigational New Drug Applications, FDA, CDER, December 2013, also citing FDA regulations, 21 C.F.R. §312.32; FDA Reviewer Guidance, "Conducting a Clinical Safety Review of a New Product Application and Preparing a Report on the Review," FDA CDER, February 2005.

dosage and administration that is intended to increase the safe use of the drug product." 21 C.F.R. §314.70(c)(6)(iii)(A) and (C).

27.     A manufacturer must revise its label "to include a warning about a clinically significant hazard as soon as there is reasonable evidence of a causal association with a drug; a causal relationship need not have been definitively established." 21 C.F.R. §201.57(c)(6). Adverse reactions must be added to the label where there "is some basis to believe there is a causal relationship between the drug and the occurrence of the adverse event." *Id*. at §201.57(c)(7).

28.     An August 22, 2008 amendment to these regulations provides that a CBE supplement to amend the labeling for an approved product must reflect "newly acquired information." 73 Fed. Reg. 49609. "Newly acquired information" is not limited to new data but also includes "new analysis of previously submitted data." "[I]f a sponsor submits adverse event information to FDA, and then later conducts a new analysis of data showing risks of a different type or of greater severity or frequency than did reports previously submitted to FDA, the sponsor meets the requirement for 'newly acquired information.'" *Id*. at 49607.

29.     The importance of the post-marketing efforts and the NDA submissions that are required throughout the marketing life of a drug product is to constantly ensure that the benefit of the drug outweighs the risk.  21 C.F.R. §§314.50, 314.80, and 314.81. If new safety information, including information from clinical trials, foreign countries or other information not previously considered by the FDA, comes to light that calls that balance into question, the FDA requires sponsors such as Defendants to initiate risk management strategies to address the safety risk, including updating the professional label.[9]

---

[9] The requirement to actively assess safety data and to update the product label is also set forth in 21 C.F.R. §201.56 and 21 C.F.R. §1.21.

### E.    Summary Regulatory History of Nexplanon

30.    Nexplanon's FDA approval was based almost exclusively on safety and clinical trial data conducted for Defendants' predecessor contraceptive drug, Implanon. Nexplanon and Implanon contain the same amount of the same hormone (68-mg of etonogestrel) and have the same serious side effects. The core difference between the drugs is that Nexplanon is radio-opaque (containing barium-sulfate), which allows a healthcare professional to use an X-ray or CT scan to locate the device after it is implanted.

31.    Implanon was initially developed by Organon BioSciences N.V. (OBS) in the Netherlands and approved by the FDA in July 2006.[10] In November 2007, OBS and its Implanon product were acquired by Schering-Plough.

32.     Shortly after Implanon came to market, regulatory agencies in multiple foreign countries (including Australia's TGA, the Dutch Medicines Agency and the U.K.'s CHM) initiated investigations into the drug's safety problems based on thousands of reports of failed implant insertions, implant migrations, and reports of difficulties in removal of the implant due to migration.

33.    In 2009, Merck & Co., Inc. acquired Schering-Plough and its subsidiaries for $41.1 billion. As part of that transaction, Merck took ownership of Organon and its Implanon and Nexplanon drug products.

34.    On July 29, 2009, Organon filed a Supplemental New Drug Application (sNDA) in furtherance of Defendants' profit-centered redesign of the soon-to-be off patent Implanon into the

---

[10] Implanon was originally rejected by the FDA due to Organon's submission of misleading clinical trial data.  *See* Clinical Review Memorandum Final Report by Barbara Wesley, M.D. FDA, Division of Reproductive and Urologic Drug Products, October 28, 2004.

patent-protected Nexplanon product. In May 2011, Nexplanon was approved by the FDA and Defendants launched the drug in the U.S. later that year.[11]

35.     Because Defendants submitted Nexplanon to the FDA as a redesign of an existing drug and not as a new drug, the FDA did not require Defendants to perform new clinical trials for Nexplanon.[12] Instead, the FDA allowed Defendants to rely upon the original 11 Implanon clinical studies. Notably, all of those studies had inclusion criteria based on "ideal body weight" and excluded obese women such as Ms. Cook. None of the Implanon studies were designed to analyze the increased risk of VTE in obese women or African-Americans.

### F.     Nexplanon's Increased Risk of VTE and Death in Obese Women

36.     Deep venous thrombosis (DVT) and pulmonary embolism (PE), together called venous thromboembolism (VTE), are serious public health concerns. There are over 900,000 cases of VTE each year in the United States, from which 300,000 individuals die.[13] VTE is the third most common form of vascular disease after heart disease and stroke. *Id.* It is a leading cause of preventable hospital death in the U.S.[14]

37.     Obesity - a medical condition suffered by Ms. Cook at the time of her Nexplanon implant and death - is a leading independent risk factor for VTE. Obesity is defined as a body mass index (BMI) of greater than 30 kg/m and is significantly associated with an increased risk of thrombosis.[15] The hazard ratio for VTE in obese individuals is at least double (and in other studies,

---

[11] At all times relevant, Defendants were engaged in the business of developing, designing, licensing, manufacturing, distribution, selling, marketing, promoting and/or insertion into interstate commerce, either directly or indirectly through third parties, subsidiaries or related entities, the etonogestrel implant, Nexplanon.

[12] The FDA only required Defendants to perform bioequivalence studies and a user satisfaction study.

[13] Heit, et al., "Estimated annual number of incident and recurrent, non-fatal venous thromboembolism (VTE) events in the US," Blood, 106:267A (2005).

[14] Maynard, et al., "Preventing hospital-acquired venous thromboembolism: a guide for effective quality improvement," AHRQ Publication, No. 16-0001-EF (2008).

[15] Tsai, et al., "Cardiovascular Risks Factors and Venous Thromboembolism Incidence: The Longitudinal Investigation of Thromboembolism Etiology," Archives of Internal Medicine, 162:1182-1189 (2002); Hoist, et al.,

triple) the risk for non-obese individuals. *Id.* The adjusted relative risks of VTE increases progressively with increasing BMI. In fact, individuals (like Ms. Cook) with a BMI ≥ 35 are three to four times as likely to develop VTE as individuals with a BMI 22.5 to 24.9.[16]

38.     In 2009, Stein et al.[17] reported that the risk for VTEs in contraceptive-using obese women is synergistically higher than in non-obese women and included a greater risk of fatality. The synergistic effect of oral contraceptives and high BMI were reported to have an odds ratio of DVT in obese women (BMI>30 kg/m2) ranging from five to seven times higher as compared to obese non-users.

39.     Obesity is common and affects about 14.4 million U.S. children and adolescents. The pediatric prevalence rate (21.2%) is highest among 12- to 19-year-olds such as Ms. Cook.[18] Obesity rates in the United States are particularly high in Arkansas.[19] The importance of providing adequate warnings about the risks of VTE and death to young obese women seeking first-time pharmaceutical contraception is critically important, especially given the limited efficacy of contraception in this subpopulation.[20]

### G.     Nexplanon's Increased Risk of VTE in African-Americans

40.     The prevalence of obesity is higher in young African-Americans (24.2%) than nearly any other ethnic group in the U.S.[21] In the U.S., the average annual rates of hospitalizations

---

"Risk Factors for Venous Thromboembolism: Results from the Copenhagen City Heart Study," Circulation, 121:1896-1903 (2010); Suchon, et al. "Risk Factors for Venous Thromboembolism under Combined Oral Contraceptive. The PILI Genetic Risk Monitoring (PILGRIM) Study," Thrombosis and Hemostasis, 115:135-142 (2015) (identifying an odds ratio of 3.46 (95% CI, 1.81 - 7.03) for patients with a BMI over 35).
[16] Parkin, et al., "Body Mass Index, Surgery, and Risk of Venous Thromboembolism in Middle-Aged Women A Cohort Study," Circulation, 125:1897-1904 (2012).
[17] Stein, et al., "Obesity and Thromboembolic Disease," Clin Chest Med, 30:489–493 (2009).
[18] CDC data at https://www.cdc.gov/obesity/data/childhood.html.
[19] CDC data at http://www.cdc.gov/obesity/data/adult.html.
[20] Holt, et al., "Body Mass Index, Weight, and Oral Contraceptive Failure Risk," Obstet Gynecol, 105:46–52 (2005).
[21] Hales, et al., "Prevalence of obesity and severe obesity among adults: United States, 2017–2018," NCHS Data Brief, No. 360 (2020); CDC data at https://www.cdc.gov/obesity/data/childhood.html.

with a discharge diagnosis of VTE among adults were 239 per 100,000 population, with the incidence being the highest for African-American patients (141 per 100,000).[22]

41.     African-Americans are also more likely to be diagnosed with PE and DVT as compared to Caucasian and other ethnic groups.[23] African Americans likewise have at least a 30%-60% higher VTE prevalence rate than other ethnic groups.[24] And African-American contraceptive users were found to have a threefold increase in the risk of VTE, including DVT and PE, compared to African-American non-users.[25]

42.     Despite the known increased risk of VTEs in African-Americans, Defendants have never designed a trial to study the increased risk to this subpopulation or sought to include warnings in the Nexplanon label for the serious risks specific to this ethnic group. In fact, by 2006 Defendants had recruited a grand total of 12 African-American patients for all of their Implanon and Nexplanon clinical trials.

**H.     Defendants' First and Second Generation Contraceptive Products and the Known Risks of VTE**

43.     Combination hormonal contraceptives (CHCs) contain two hormones: estrogen and progestin. The progestin inhibits ovulation, while the estrogen component primarily mitigates breakthrough bleeding. The most common estrogen in CHCs is ethinyl estradiol (EEI), which has been used with various progestins over the years to form combination oral contraceptives. CHCs

---

[22] *See* Yusuf, et al., "Venous Thromboembolism in Adult Hospitalizations – U.S., 2007-2009," MMWR Vol.61, No. 22, (2012); White, et al., "Incidence of idiopathic deep venous thrombosis and secondary thromboembolism among ethnic groups in California," Ann Intern Med, 128: 737–40 (1998); White, et al., "Effect of ethnicity and gender on the incidence of venous thromboembolism in a diverse population in California in 1996," Thromb Haemost, 93(2):298-305 (2005).

[23] White, et al., "Effect of ethnicity and gender on the incidence of venous thromboembolism in a diverse population in California in 1996," Thromb Haemost, 93(2):298-305 (2005).

[24] Hernandez, et al., "Novel genetic predictors of venous thromboembolism risk in African Americans," Blood, 127(15):1923-1929 (2016).White, et al., "Effects of race and ethnicity on the incidence of venous thromboembolism," Thromb Res., 123 Suppl 4:S11-7 (2009).

[25] Austin, et al., "Hormonal contraception, sickle cell trait, and risk for venous thromboembolism among African American women," AM J Obstet Gynecol, 200: 620.el-620.e3 (2009).

are typically grouped by generation, each typically using the following progestins: first generation – norethynodrel; second generation – levonorgestrel; third generation – desogestrel, gestodene or norgestimate.  Implanon and Nexplanon are third generation CHCs.

44.     Desogestrel is a progestin contraceptive that was developed by Organon in 1972. The FDA approved the first oral contraceptive desogestrel product (Desogen) in 1992.   Desogen was made by Organon and followed by multiple other Organon desogestrel products, including Mircette (desogestrel/etonogestrel), NuvaRing (desogestrel/etonogestrel ring), Implanon and Nexplanon (etonogestrel implants). Organon's Nexplanon implant rod releases etonogestrel (formerly known as 3-ketodesogestrel), which is the biologically active metabolite of desogestrel.

45.     Prior to seeking approval for Nexplanon in July of 2009, Defendants knew that i) their older third generation desogestrel products, Desogen and Mircette, carried an increased risk of VTE and arterial thrombotic events, ii) Nexplanon contained the same active chemical as Desogen and Mircette, and iii) Nexplanon like its predecessors would carry an increased risk of VTE events and fatalities.

46.     Organon knew as early as 1995 that peer reviewed papers reported that Organon's third generation products (like Desogen) had higher risks of VTE and arterial thrombotic events than the older first and second generation contraceptives. For example, in 1995, Jick, et al.[26] reported on their study of 370 general practices in the United Kingdom, in which there were 80 cases of nonfatal VTE in a cohort of 238,130 otherwise healthy non-obese women. The incidence rates of VTE per 100,000 woman-years at risk were 16.1 for levonorgestrel users, 29.3 for desogestrel, and 28.1 for gestodene.

---

[26] Jick, et al., "Risk of idiopathic cardiovascular death and nonfatal venous thromboembolism in women using oral contraceptives with differing progestagen components," Lancet, 346:1589-93 (1995).

47.     The Jick study was followed by Bloemenkamp, et al. in 1995,[27] who also reported elevated relative risks (RR) for Organon's desogestrel (also etonogestrel) with a RR of 8.7 compared to the first generation OCs with an RR of 3.8.

48.     On December 16, 1995, the World Health Organization published two studies in *Lancet* regarding the increased risk of VTE from progestin contraceptive products. These studies were some of the first studies to evaluate the risks of cardiovascular disease (CVD)[28] and thrombotic events[29] associated with the use of oral and injectable progestin-only and combined injectable contraceptives.

49.     The results of one of the WHO studies showed a range of relative risks of 7 to 12 for third generation OCs, including desogestrel.[30] More importantly, the investigators found there was an increasing risk of VTE associated with increased levels of BMI over 20 kg/m2. The WHO recommended that women with a higher BMI should be warned about these increased risks.

50.     The second WHO study focused on the risk of only VTE associated with low estrogen (<35µg ethinyloestradiol) OCs containing levonorgestrel with risks in low estrogen preparations containing the third generation progestins desogestrel or gestodene.[31] This study also confirmed that the risk of VTE from third generation OCs (including desogestrel) was 2-4 times

---

[27] Bloemenkamp, et al., "Enhancement by Factor V Leiden Mutation of Risk of Deep-Vein Thrombosis Associated with Oral Contraceptives Containing a Third-generation Progestagen," Lancet, 346:1593-96 (1995).

[28] World Health Organization Collaborative Study of Cardiovascular Disease and Steroid Hormone Contraception, "Venous Thromboembolic Disease and Combined Oral Contraception; Results of International Multicentre Case Control Study," Lancet, 346:1575–82 (1995).

[29] World Health Organization Collaborative Study of Cardiovascular Disease and Steroid Hormone Contraception, "Effect of different progestagens in low oestrogen oral contraceptives on venous thromboembolic disease," Lancet, 346:1582-88 (1995).

[30] World Health Organization Collaborative Study of Cardiovascular Disease and Steroid Hormone Contraception, "Venous Thromboembolic Disease and Combined Oral Contraception; Results of International Multicentre Case Control Study," Lancet, 346:1575–82 (1995).

[31] World Health Organization Collaborative Study of Cardiovascular Disease and Steroid Hormone Contraception, "Effect of different progestagens in low oestrogen oral contraceptives on venous thromboembolic disease," Lancet, 346:1582-88 (1995).

higher than levonogestrel, and that the specific relative risks for desogestrel after adjusting for confounding factors was 7.3-8.3, which is statistically significant.

51.     This WHO study also reported that the incidence of VTE was estimated to be 3.9 for non-users, 10.3 for levonorgestrel users, 21.3 for users of desogestrel or gestodene, and 12.3 for users of other OCs per 100,000 woman-years. The excess for users of desogestrel or gestodene over levonorgestrel OCs was 11.0 per 100,000 woman-years. Further, the incidence of VTEs associated with desogestrel was the highest among the third generation OCs with an incidence of 21.3 - 41 per 100,000 woman-years.[32]

**I.      Defendants' U.S. Nexplanon Label**

52.     Defendants' U.S Nexplanon label does not contain any warning for the increased risk of VTE to obese women or African-Americans. Nor does it contain any statistical safety data regarding the risk of VTE that would allow a prescribing physician to place the risk of VTE in context against the risk of the same reactions from safer alternative drugs.

53.     In contrast, the European Medicines Agency and the Committee for Medicinal Products for Human Use (CHMP) in the European Union require Defendants to maintain a risk management plan (RMP) to continuously monitor and report on the safety of Nexplanon's risk of VTE. In that RMP, Defendants disclose to foreign regulators and prescribing physicians that obesity is an "Important Potential Risk" for Nexplanon because obesity increases the risk of VTE and arterial thrombotic events from the drug.[33] Defendants' RMP also recommends that physicians

---

[32] World Health Organization Collaborative Study of Cardiovascular Disease and Steroid Hormone Contraception, "Effect of different progestagens in low oestrogen oral       contraceptives on       venous thromboembolic disease," Lancet, 346:1582-88 (1995); Jick, et al., "Risk of venous thromboembolism among users of third generation oral contraceptives compared with users of oral contraceptives with levonorgestrel before and after 1995: cohort and case-control analysis," BMJ, Vol. 321 (2000).

[33] Defendants' Canadian label likewise contains stronger warnings for VTE and related risks applicable to Ms. Cook.

who prescribe Nexplanon solicit from the patient any family history of blood clots, in part because

of the increased risk of VTE from Nexplanon.[34]

54.     Defendants' U.S. labeling, set out in relevant part below, does not include these

critical safety-related recommendations:

| NEXPLANON |
| --- |
| THOMBOTIC AND OTHER VASCULAR EVENTS: The use of combination hormonal contraceptives (progestin plus estrogen) increases the risk of vascular events, including arterial events (strokes and myocardial infarctions) or deep venous thrombotic events (venous thromboembolism, deep venous thrombosis, retinal vein thrombosis, and pulmonary embolism). Nexplanon is a progestin-only contraceptive.  It is unknown whether this increased risk is applicable to etonogestrel alone.  It is recommended, however, that women with risk factors known to increase the risk of venous and arterial thromboembolism be carefully assessed.<br><br>There have been postmarketing reports of serious arterial thrombotic and venous thromboembolic events, including cases of pulmonary emboli (some fatal), deep vein thrombosis, myocardial infarction, and strokes, in women using etonogestrel implants. Nexplanon should be removed in the event of thrombosis.  October 2018 label at pp. 16-17. |

55.     In contrast, Defendants' other desogestrel and etonogestrel contraceptive products

(Desogen, Mircette and NuvaRing) and other drug product labels have, for decades, contained

stronger warnings - including statistical risk data - for the risks at issue in this case:

| NUVA-RING[35] (Merck contraceptive drug) |
| --- |
| The use of oral contraceptives is associated with increased risks of several serious conditions including venous and arterial thrombotic and thromboembolic events (such as myocardial infarction, thromboembolism, and stroke), hepatic neoplasia, gallbladder disease, and hypertension, although the risk of serious morbidity or mortality is very small in healthy women without underlying risk factors.<br><br>The risk of morbidity and mortality increases significantly in the presence of other underlying risk factors such as certain inherited thrombophilias, hypertension, hyperlipidemias, ***obesity***, and diabetes. Practitioners prescribing oral contraceptives should be familiar with the following information relating to these risks. |

---

[34] In addition to being obese, Ms. Cook had a family history of blood clots.

[35] Defendants could have (but did not) seek the same warnings for Nexplanon regarding the increased risk of VTE and death as they used in its NuvaRing product.

a. Thromboembolism: An increased risk of thromboembolic and thrombotic disease associated with the use of oral contraceptives is well established. Case control studies have found the relative risk of users compared to non-users to be 3 for the first episode of superficial venous thrombosis, 4 to 11 for deep vein thrombosis or pulmonary embolism, and 1.5 to 6 for women with predisposing conditions for venous thromboembolic disease (2,3,19–24).   Cohort studies have shown the relative risk to be somewhat lower, about 3 for new cases and about 4.5 for new cases requiring hospitalization (25).

Several epidemiologic studies indicate that third generation oral contraceptives, including those containing desogestrel, are associated with a higher risk of venous thromboembolism than certain second-generation oral contraceptives (100–102). In general, these studies indicate an approximate two-fold increased risk, which corresponds to an additional 1–2 cases of venous thromboembolism per 10,000 women-years of use…. The relative risk of venous thrombosis in women who have predisposing conditions is twice that of women without such medical conditions (9,26).

b. Myocardial infarction: An increased risk of myocardial infarction has been attributed to oral contraceptive use. This risk is primarily in smokers or women with other underlying risk factors for coronary artery disease such as hypertension, hypercholesterolemia, ***morbid obesity***, and diabetes. July 29, 2005 label at pp. 11-13 (emphasis added).

LYNPARZA (Merck cancer drug)

Venous Thromboembolic Events: Including pulmonary embolism, occurred in 7% of patients with metastatic castration-resistant prostate cancer who received LYNPARZA plus androgen deprivation therapy (ADT) compared to 3.1% of patients receiving enzalutamide or abiraterone plus ADT in the PROfound study. Patients receiving LYNPARZA and ADT had a 6% incidence of pulmonary embolism compared to 0.8% of patients treated with ADT plus either enzalutamide or abiraterone. Monitor patients for signs and symptoms of venous thrombosis and pulmonary embolism, and treat as medically appropriate, which may include long-term anticoagulation as clinically indicated.  June 2021 label at p. 3.

KEYTRUDA (Merck cancer drug)

Adverse reactions leading to interruption of KEYTRUDA occurred in 33% of patients; the most common adverse reactions or laboratory abnormalities leading to interruption of KEYTRUDA (≥2%) were pneumonitis (3.1%), pneumonia (3.0%), hypothyroidism (2.2%), and increased ALT (2.0%). The most frequent (≥2%) serious adverse reactions were pneumonia (7%), pneumonitis (3.9%), pulmonary embolism (2.4%), and pleural effusion (2.2%).  2021 label at p. 23.

ONTRUZANT (Merck cancer drug)

Thrombosis/Embolism.  In 4 randomized, controlled clinical trials, the incidence of thrombotic adverse events was higher in patients receiving trastuzumab and chemotherapy compared to

chemotherapy alone in three studies (2.6% vs. 1.5% [Study 1], 2.5% and 3.7% vs. 2.2% [Study 4] and 2.1% vs. 0% [Study 5]).  2020 label at p. 21.

56.     Despite the use of stronger warnings in their other drug labels, Defendants have never proposed adding frequency or incidence safety data for the risks identified herein to the U.S. Nexplanon label.

57.     The bottom line is that Defendants should have warned U.S. doctors and consumers about the well-known increased and statistical risk of Nexplanon-caused VTE – particularly in vulnerable subpopulations – as they do in foreign countries and in their other prescription drug product labels. And they should have done so years before Ms. Cook's doctor prescribed this elective, non-essential, and ultimately fatal contraceptive to this unwitting high school student.

**J.     New Safety Information**

58.     Defendants should have sought to include the warnings at issue in this Complaint at the time Defendants applied for and pursued FDA approval from July of 2009 through 2011 (pre-approval claims). In addition, Defendants should have unilaterally strengthened the warnings after Nexplanon was approved by the FDA (post-approval claims).[36]

59.     Plaintiffs' pre-approval claim stems from Defendants' failure to seek a stronger initial Nexplanon label for FDA consideration during the sNDA process. Defendants could have (but did not) seek to add warnings for the known risks identified herein at the time they sought FDA approval of the Nexplanon label.

---

[36] More specifically, Plaintiffs' claims in this case include i) pre- and post-approval claims relating to warnings that have never been in the label regarding the statistical risk of VTE and the increased risk of VTE in obese and African-American women, and ii) post-approval claims relating to Defendants' vastly understated general reference the risk of VTE (in all populations) on the basis that new safety information (addressed in the Complaint) has emerged since FDA approval in 2011.  *See Stube v. Pfizer Inc.*, 446 F. Supp. 3d 424, 438–39 (W.D. Ark. 2020) (case involving Plaintiffs' counsel; denying drug company's preemption-based motion to dismiss and adequacy of label defense regarding a black box warning label and similar pleading allegations of pre- and post-approval conduct).

60.     Further, following Nexplanon's May 2011 FDA approval, new safety information emerged that should have prompted Defendants to unilaterally change the Nexplanon label (pursuant to the CBE-0 process in 21 C.F.R. §314.70) to warn for the increased risks of VTE in obese woman and African-Americans and to include statistical safety data about these risks.

### (i)     Undisclosed Cases of VTE, Strokes and Cardiovascular Events from Clinical Trials

61.     Defendants know that it is critically important to disclose all serious adverse events occurring in their clinical trials. The FDA also requires Defendants to regularly review and update the Nexplanon label to identify new safety information arising from clinical trials:

> Applicants are urged to review at least annually the content of the adverse reactions section [of the label] to ensure that the information remains current.  We expect the labeling to be consistent with newly acquired information from controlled clinical trials or spontaneous reports and with the evolution of labeling in the pertinent drug class. . . The applicant must update the labeling when new information becomes available that causes the labeling to become inaccurate, false, or misleading.[37]

62.     Even a single case of a VTE (including arterial embolisms, heart attacks and stroke) occurring in a clinical trial is a significant safety event that requires safety surveillance by the drug manufacturer. Despite this obligation, Defendants repeatedly ignored cases of VTE in their own clinical trials.  A few examples include:

- The NORA study (2011-2017) was designed to characterize the frequency of insertion, localization and removal-related events and clinically significant consequences among Nexplanon users in the U.S.  In this study, there were eight reports of women who suffered deep venous thrombosis, three of whom also suffered pulmonary embolism.  Several of the cases of VTEs and pulmonary embolus were in obese and young patients who were first time users of Nexplanon.[38]

- In 2006, the safety dataset for the 4 Implanon clinical trials noted that there was one case of DVT, one case of embolic transient ischemic attack, one case of rupture of an

---

[37] FDA Guidance for Industry (CDER): Adverse Reactions Section of the Labeling for Human Prescription Drug and Biological Products (January 2006);  Sherman, et al., "New FDA Regulation to Improve Safety Reporting in Clinical Trials," N Engl J Med 365;1 (2011) (commenting that even a single case of a rare and unexpected adverse event in a clinical trial can substantially alter the safety profile of a drug).

[38] Etonogestrel Implant/MK-8415, Protocol No: P08290 – NORA Final Study, May 2013.

arteriovenous left occipital malformation with cerebral hemorrhage, one case of stroke and one case of thrombosis.[39] There was an additional report of DVT in a study subject in Implanon Study #34528.[40]

- Other Nexplanon studies identified two more cases of DVT/VTEs.  These two cases occurred among a small data set of patients exposed to Nexplanon (420 patients) resulting in an estimated rate of VTEs 2 times higher than previously reported (4 per 1000 patients).[41]

- There were two cases of DVT in studies P05702 and 34528, even though the studies were designed to exclude obese patients.[42]

- In late 2004, Organon identified the rate of Nexplanon post-marketing worldwide VTEs to be nearly 1 per 100,000 person years (10 per million).[43] The combined rates of (Europe+ other worldwide countries) VTEs were much higher with the estimated rates being 2 per 100,000, or 20 per million.[44]

- By May of 2005, there were a total of 51 reports of VTEs worldwide, including 20 reports of PE, 31 reports of DVT, 32 reports of stroke and 4 heart attacks.[45]

63.    These and other clinical trial cases of VTE were not disclosed to the FDA, to U.S. prescribing physicians or to Ms. Cook's prescribing physician through the Nexplanon label.

**(ii)    Undisclosed Safety Data from the Scientific Literature**

64.    After Nexplanon was approved in 2011, several scientific studies identified an increased risk of VTE from Nexplanon:

- In 2012, Mantha, et al.[46] evaluated the risk of VTE associated with progestin-only contraception products. Eight observational studies were included in the Mantha, et al. review (8,900 total patients): five case-control studies (6,658 patients) and three retrospective cohort studies (2,242 patients). Based on their meta-analysis, the

---

[39] *Id.*

[40] Organon conceded that a substantial number of adverse events occurred, but were not reported following safety audits: "Accurate and complete capture of SAEs for long periods in the (Implanon) trial is questionable." *See* Division Director Memorandum by Scott Monroe, M.D., Division of Reproductive and Urologic Products (DRUP)  dated July 17, 2006.

[41] CADTH Common Drug Review, Clinical Review Report: Etonogestrel Extended-Release Subdermal Implant (Nexplanon) Merck Canada Inc. (December 2020).

[42] Mommers, et al., "Nexplanon, a radiopaque etonogestrel implant in combination with a next-generation applicator: 3-year results of a noncomparative multicenter trial," Am J Obstet Gynecol, 207(5): 388.e1-6 (2012).

[43] *See* Organon's 2004 supplemental NDA submission to the FDA.

[44] *Id*.

[45] *See* Organon's 2005 supplemental NDA submission to the FDA.

[46] Mantha, et al., "Assessing the risk of venous thromboembolic events in women taking progestin-only contraception: a meta-analysis," BMJ, 345.e4944 (2012).

authors found that the risk of VTE was statistically significantly higher for users of progestin only products similar to Implanon/Nexplanon versus non-users (RR 2.67, 95% CI 1.29 to 5.53).

- In 2012, Lidegaard, et al.[47] also performed a cohort study that reported that desogestrel had higher risks of thrombotic stroke and myocardial infarction compared to other OCs. They likewise found that the progestin implant (Nexplanon) had an increased adjusted relative risk of 2.14 reflecting a doubling of the risk of myocardial infarction.

- In 2015, Vinogradova, et al.[48] analyzed two nested case control studies and found that desogestrel contraceptive products carried the highest risk of VTEs among most other OCs; that the incidence of VTE associated with desogestrel use in ages 15-49 is 14 per 100,000; and that the next highest incidence of VTEs associated with other contraceptives is only 7 per 100,000.

- In 2019, Kennan, et al.[49] reported on their meta-analysis of case control studies to determine the risks for users versus non-users between first, second, and third generation OCs, including Defendants' Nexplanon. All of the desogestrel OC products showed much higher risks (3-6 times higher) of VTEs than the first and second generation OCs.

- In 2018, Glisic, et al.[50] performed a systematic review and meta-analysis of previously published studies that evaluated the association between progestin-only contraceptive (POC) use and the risk of various cardiometabolic outcomes across 19 studies. Of those, nine studies reported the risk of venous thromboembolism, six reported the risk of myocardial infarction, six reported the risk of stroke, three reported the risk of hypertension and two studies reported the risk of developing diabetes with POC use. Stratified analysis by Glisic, et al. of the route of administration showed that progestin contraceptives (similar to Nexplanon) had a relative risk of 2.62, or an over 2 times higher risk of VTE.

The results of these studies and the safety data therein should have been (but was not) included in the Nexplanon label and should have been (but was not) fully disclosed to the FDA.

---

[47] Lidegaard, et al., "Thrombotic Stroke and Myocardial Infarction with Hormonal Contraception," NEJM, 366(24): 2257-2266 (2012).
[48] Vinogradova, et al., "Use of combined oral contraceptives and risk of venous thromboembolism: nested case-control studies using the QResearch and CPRD databases," BMJ, 350:h2135 (2015).
[49] Kennan, et al., "Systematic Review of Hormonal Contraception and Risk of Venous Thrombosis," The Linacre Quarterly, 85(4): 470-477 (2019).
[50] Glisic, et al., "Association between progestin-only contraceptive use and cardiometabolic outcomes: A systematic review and meta-analysis," European Journal of Preventive Cardiology, 25(10):1042–1052 (2018).

### (iii)     Undisclosed Adverse Events and Safety Signal Analysis

65.     Under FDA regulations, Defendants are required to fully disclose all adverse event data they received about the use of Nexplanon. Adverse drug events are important because drug companies are required to use them to assess causality and to identify safety signals.

66.     Defendants' adverse events are stored in their global safety database and are directly accessible to Defendants at all times. Defendants failed to review and report to the FDA all serious cases of Nexplanon-related adverse events that Defendants maintain in their adverse event database. In addition, Defendants "soft coded"[51] relevant Nexplanon adverse events and failed to adequately track, analyze and report safety signals that emerged from these adverse events. In addition to the safety information discussed above, Defendants knew or should have known about an increase in the number of Nexplanon adverse events, all of which constituted newly-acquired information.

67.     The substantial number of Nexplanon-related adverse events in the FDA's FAERS database is particularly concerning given the unprecedented marketing scheme Defendants implemented in their successful effort to sell Nexplanon to as many U.S. and global consumers as possible. A summary of relevant reporting numbers for Nexplanon follows:[52]

- 30,000 total adverse reports since 2011 approval;

- 6,000 of the reports are classified as "serious";

- 47 of the reports involve a death;

---

[51] "Soft coding" occurs when a drug company, during the adverse event data entry process, selects a medical term to code the adverse event that is less severe than the correct adverse event term.

[52] A summary of reporting numbers from FAERS for Implanon reflects: 2,500 of the reports are classified as "serious"; 30 of the reports involve a death; 487 relate to vascular adverse events (of those, 267 were reported as "serious" and 7 involved a death); 55 reports of DVT that were serious; 49 reports of pulmonary embolism with 8 associated deaths; for ages 15-21 (adolescents like Ms. Cook), a total of 7 reports of pulmonary embolism; all of the reports of involved females.

- 1,043 relate to vascular adverse events (of those, 395 were reported as "serious" and 4 involved a death);

- 130 reports of DVT classified as "serious";

- 121 reports of pulmonary embolism with 8 associated deaths;

- for ages 15-21 (adolescents like Ms. Cook), a total of 11 reports of pulmonary embolism;

- all of the reports involved females;

- the earliest publicly available reports of VTE occurred in 2007 while Nexplanon was an investigational drug.

68.     Vigibase, the European Union's safety database equivalent to FAERS, also contains thousands of reports of serious adverse events associated with etonogestrel products in both the vascular disorders MedDRA category and the respiratory disorders category, over 180 reports of pulmonary embolisms and 11 deaths.

69.     By the time that Nexplanon was implanted into Ms. Cook, Defendants were aware of thousands of serious adverse events associated with Implanon and Nexplanon, over 1,000 vascular disorders and nearly 100 reports of pulmonary embolism from Nexplanon alone. Defendants should have but did not study and disclose this increase in adverse events to the FDA.[53]

## K.     Summary of Defendants' Concealment of New Safety Information

70.     Defendants are solely responsible for the accuracy and content of their drug label. A drug manufacturer has a duty to promptly modify its label to add or strengthen a contraindication, warning, precaution, and adverse reaction to support the safe use of its drug when data, analyses, or other information not previously submitted to the FDA reveals risks of a different

---

[53] Thrombotic events like VTE should be included on "designated medical events" lists (DMEs) in order to closely monitor and assess the drug's safety which may trigger a safety signal on the basis of only a few cases because they are rare, medically serious, and associated with a high drug-attributable risk.  Schotland, et al., "Target Adverse Event Profiles for Predictive Safety in the Post-market Setting," Clinical Pharmacology & Therapeutics, 109(5):1232-1243 (2021); Hauben, et al., "Early Postmarketing Drug Safety Surveillance: Data Mining Points to Consider," Annals of Pharmacotherapy 38(10): 1625-1630 (2004).

type or greater severity or frequency than previously included in submissions to FDA. 21 C.F.R. §314.70; 21 C.F.R. §314.3(b). Defendants have always had the power to unilaterally update their label under the FDA's changes being effected CBE-0 regulation. *Id.*

71.     Defendants are also required to conduct adequate pre- and post-approval safety surveillance for all of their drugs, including Nexplanon, by collecting and evaluating aggregated safety data and scientific literature relating to the adverse effects of those drug products. Defendants are required by law to analyze and determine whether safety signals exist; to report those safety findings to the FDA; to continuously revise and update their product labels; and to identify and disclose to the FDA and prescribing physicians the current risks associated with Nexplanon in order to allow for the safe and effective use and monitoring of their drug.

72.     The information not previously submitted to the FDA by Defendants, both before and after 2011 to the present, encompasses information critical for a physician's assessment of the risks of prescribing Nexplanon. These risks include risks of a different type, greater severity and greater frequency than previously submitted to the FDA, including but not limited to:

- the reports of serious VTEs in the pre-approval and post approval clinical trials for Nexplanon;

- pre-approval and post-approval clinical trial incidences, severity and outcomes of VTEs associated with Nexplanon;

- post-marketing incidences and reporting rates of serious VTEs;

- that the number of Nexplanon fatalities from VTEs and other thrombotic events was higher than previously known;

- that Nexplanon has an increased risk of VTE in African-American and obese women;

- that there was an increased risk of fatalities from Nexplanon use and an even higher risk of fatalities in the at-risk African-American and obese subpopulations; and

- disclosure of the odds ratios or relative risk of VTEs and myocardial infarctions from Nexplanon.

Plaintiffs' Original Complaint

Page 26

The safety data discussed above shows that the risks of Nexplanon use are of a different and greater severity and frequency than what has been disclosed to the FDA and U.S. prescribing physicians.

**J.     Ms. Cook's Prescribing Physician Relied on Defendants' False and Misleading Safety Information**

73.     Prescribing physicians analyzing the risk benefit profile of contraceptive options for patients such as Ms. Cook – an adolescent 19-year-old obese African-American female seeking her first contraceptive therapy – should be fully informed of the significant risks of VTEs and vascular disorders associated with Nexplanon. Due in part to the availability of alternate contraceptive drugs at the time of his prescription to Ms. Cook, Dr. Jason Hurt assessed the risks and benefits of the use of contraceptive drugs (including Nexplanon) for Ms. Cook. In evaluating the appropriate contraceptive therapy for Ms. Cook, Dr. Hurt intended to select the contraceptive therapy that would be the most tolerable for her conditions, had the lowest potential for harm or risk of death, the least likelihood of negatively impacting her quality of life, and which would also be effective.

74.     At the time he prescribed Nexplanon to Ms. Cook, Dr. Hurt was exposed to and relied upon the following omissions and misrepresentations in the Nexplanon labeling, patient information leaflet, and other written information distributed by Defendants, including their physician detailing and marketing materials. Dr. Hurt would not have prescribed Nexplanon to Ms. Cook had he known of the new material safety data and information described above and below:

- Nexplanon has an increased risk for VTEs, strokes, myocardial infarctions, and other serious thrombotic adverse events, particularly in the obese and African-American subpopulations;

- Defendants had experienced cases of VTEs in their pre-approval and post-approval clinical trials;

- Defendants failed to fully report all cases of VTEs, strokes, myocardial infarctions, and other serious thrombotic adverse events to the FDA;

- Nexplanon has a substantially increased risk of VTEs, thrombotic events, strokes, myocardial infarctions and fatalities over alternative contraceptive therapies based on case-control, cohort and case series studies;

- Nexplanon should be restricted from use in patients with Ms. Cook's clinical circumstances (*i.e.* obese and African-American) due to its elevated risk and frequency of VTEs, thrombotic events, strokes, myocardial infarctions and fatalities over alternative contraceptive therapies;

- Nexplanon users have 2-4 times higher risks of VTEs, thrombotic events, strokes, myocardial infarctions and fatalities over alternative contraceptive therapies;

- Pooled studies or meta-analysis reflected a higher number of cases of VTEs, thrombotic events, strokes, myocardial infarctions and fatalities over alternative contraceptive therapies;

- The Nexplanon labeling does not disclose the odds ratios or relative risk of VTEs, thrombotic events, strokes, myocardial infarctions and fatalities when Defendants know that desogestrel/etonogestrel products had the highest relative risks of VTEs and myocardial infarctions of nearly all contraceptive drug products; and

- Defendants failed to adequately study the risks of VTEs, thrombotic events, strokes, myocardial infarctions and fatalities in obese and African-American patients like Ms. Cook.

75.     In prescribing Nexplanon to Ms. Cook, Dr. Hurt relied on Defendants to fairly and accurately disclose the increased risks, incidence and frequencies from the clinical trials, published literature and spontaneous reporting data. He was not aware of the false and misleading safety information described above, or of Defendants' omission from and affirmative misrepresentations contained in the Nexplanon label and prescribing information with regard to the risks of VTEs, thrombotic events, strokes, myocardial infarctions and fatalities in obese and African-American females.

76.     As an OB/GYN, Dr. Hurt has the option to prescribe a large volume of different contraceptive therapies to his patients. It is impractical to place the burden on or expect every physician to manage a medical practice, effectively treat their patients, and review all of the

available safety literature or spontaneous reporting data regarding every drug that may be applicable to their practice. These obvious impracticalities are, in part, why federal regulations place the burden to adequately warn on drug companies such as Defendants who have made billions of dollars from the sales of Nexplanon. It is Defendants' legal duty to disclose all material safety information regarding the safety risks of their drugs.

77.     It is Dr. Hurt's practice to rely on safety information provided by drug companies like Defendants (including but not limited to prescribing information disseminated in labeling, patient information leaflets, medication guides, DHCP letters, sales representative detail efforts, and at medical conferences), and he was exposed to, reviewed and relied upon the safety information referenced above when he was analyzing the safest and most effective contraceptive therapies for Ms. Cook.

78.     Had the label, DHCP letters, sales detail efforts, or the medication guide for Nexplanon accurately disclosed the increased risk of VTEs, thrombotic events, strokes, myocardial infarctions and fatalities, including in obese and African-American females, Dr. Hurt would not have prescribed Nexplanon to Ms. Cook when safer alternative contraceptive therapies with little to no increased risks of VTEs like IUDs and other implants or injectables carry much lower risks of VTEs.  It was foreseeable to Defendants that U.S. physicians including Dr. Hurt would rely upon the safety information contained in the Nexplanon label and detail efforts when he prescribed the drug. Dr. Hurt did in fact rely on the completeness and accuracy of Defendants' warnings and sales detailing in prescribing Nexplanon to Ms. Cook.

79.     Had Defendants accurately disclosed the increased risks of VTEs, thrombotic events, strokes, myocardial infarctions and fatalities from Nexplanon, including the increased risk in obese and African-American females, Dr. Hurt would not have prescribed Nexplanon to Ms.

Cook, she would not have had Nexplanon implanted into her body, and she would not have been killed by the drug.

80.    At the time Defendants made the above-described representations and nondisclosures, Plaintiffs and Ms. Cook's prescribing physician were ignorant of the falsity of the representations and reasonably believed them to be true. In fact, Defendants knew that prescribing physicians were unaware of the increased risks the risks of VTEs, thrombotic events, strokes, myocardial infarctions and fatalities, including from Nexplanon in obese and African-American females, and Defendants fraudulently concealed such risks from Plaintiff's prescribing physician.

81.    Ms. Cook's wrongful death and Plaintiffs' injuries were a foreseeable and proximate result of the false and misleading information Defendants disseminated to Plaintiff's prescribing physician. But for the above misrepresentations, actions, and omissions of Defendants, Ms. Cook would be alive and unharmed.

## IV.    CAUSES OF ACTION

## COUNT I - STRICT PRODUCTS LIABILITY/FAILURE TO WARN

82.    Plaintiffs incorporate by reference each and every paragraph of this complaint as set forth in full below.[54]

83.    Defendants designed, tested, manufactured, marketed, distributed and supplied Nexplanon. As such, Defendants had a duty to adequately test the product in conformance with the standards of care to ensure that the risks and benefits of the drug were sufficient for the safe and effective use of the drug for its approved indications, and to warn healthcare providers of the health risks and dangers associated with using the medication.

---

[54] Plaintiffs' allegations and claims against Defendants Merk & Co., Inc. and Merck Sharp & Dohme Corp. are limited to the timeframe 2009 (when it acquired Nexplanon) to present.  Plaintiffs' claims against Defendant Organon are not date restricted and include all pre- and post- approval allegations of wrongful conduct

84.     Nexplanon was in the exclusive control of Defendants and was sold without adequate directions of use and without adequate warnings regarding the increased risks, incidences and frequencies of VTEs, including DVT and pulmonary embolus, strokes and heart attacks and fatalities, and other risks addressed above.

85.     As a direct and proximate result of the defective condition of Nexplanon, as tested, manufactured, marketed and/or supplied by Defendants, and as a direct and proximate result of negligence, gross negligence, willful and wanton misconduct, and other wrongdoing and actions of Defendants described herein, Plaintiffs suffered injury, damages and economic loss as alleged herein.

86.     Defendants knew of the defective nature of Nexplanon, but continued to test, manufacture, market, and sell the medication to maximize sales and profits at the expense of public health and safety, in knowing, conscious, and deliberate disregard of the foreseeable harm caused by the medication, and in violation of their duty to provide accurate, adequate, and complete directions for use and warnings concerning the drug.

87.     Defendants failed to warn Plaintiff's prescribing physician of the dangerous propensities of Nexplanon, which were known or should have been known to Defendants, as they were scientifically readily available.

88.     Defendants knew and intended for Nexplanon to be prescribed by OB-GYN physicians and to be used by persons with a prescription, without any inspection for defects. Defendants also knew that physicians would rely upon the representations made by Defendants in

their applications/dossiers, product labels, patient information leaflets and medication guides, and in other promotion and sales materials upon which Plaintiff's prescribing physician did so rely.[55]

89.     As a direct and proximate result of Defendants' sale of Nexplanon without adequate directions of use and adequate warnings regarding the increased risks, incidence and frequencies of VTEs, including DVT and pulmonary embolus, strokes, heart attacks, and fatalities associated with its use, including in the obese and African-American subpopulations, Plaintiffs suffered harm as alleged herein. Defendants' conduct in the testing, packaging, warning, marketing, advertising, promotion, distribution, and sale of Nexplanon was committed with knowing, conscious and deliberate disregard for the rights and safety of consumers such as Plaintiffs, thereby entitling Plaintiffs to punitive damages in an amount appropriate to punish Defendants and deter them from similar conduct in the future.

## COUNT II – FRAUD AND FRAUDULENT INDUCEMENT

90.     Plaintiffs incorporate by reference each and every paragraph of this complaint as though set forth in full herein.

91.     Under the Code of Federal Regulations, Defendants also have a mandatory duty to ensure their Nexplanon warnings to the medical community are accurate, adequate, and not false or misleading in any particular.  21 C.F.R. §201.56. Defendants also has a mandatory duty to conduct sufficient post market safety surveillance; to review all adverse drug event information; to report any safety information bearing on the risk-benefit profile associated with Nexplanon to the medical community; and to update the Nexplanon labeling and otherwise inform and educate

---

[55] Although Ms. Cook did not receive warnings about the increased risks at issue in this case, Plaintiffs do not contend that Defendants were required under Arkansas law to separately warn the Plaintiffs. Rather, Plaintiffs contend that Defendants failed to discharge their legal duty to adequately warn Plaintiff's prescribing physician.

Plaintiff's prescribing physician, Plaintiff and other foreseeable users about new safety information bearing on the risk profile of the drug.[56]

92.     FDA regulations are minimum levels of the standard of care for a reasonable and prudent drug company that markets an approved drug in the U.S. Defendants breached their duty or standard of care to Plaintiff's prescribing physician because they concealed the material safety information identified in the Complaint (including the safety information set forth in Section J above) from Plaintiff's prescribing physician in Arkansas through the misleading Nexplanon label, misleading and false promotional materials, sales representative detail efforts and inaccurate direct-to-physician communications. The concealment and fraudulent conduct was directed at Arkansas prescribing physicians (including Dr. Hurt), had injurious consequences in Arkansas, and occurred on each date Defendants' sales representatives detailed Dr. Hurt and each time Dr. Hurt reviewed the inaccurate Nexplanon label, including but not limited to Dr. Hurt's review of the Nexplanon label prior to his March 2021 prescription of Nexplanon to Ms. Cook as well as on the dates Dr. Hurt received Nexplanon detail and training information from Defendants.

93.     From 2011 through the present, Defendants made misrepresentations of material facts to, omitted and/or concealed material facts from Plaintiff's prescribing physician during the life cycle of the product including but not limited to each time a prescription was written or filled; when the safety information identified above emerged and was not disclosed by Defendants; each time Defendants updated their label and failed to include the warnings at issue; when they sent DHCP letters and omitted these risks; when Defendants sent or transmitted promotional materials directly to Plaintiffs; and in the aggressive advertising and detailing of Nexplanon to Ms. Cook's prescribing physician in the State of Arkansas.

---

[56] *See* 21 C.F.R. §§ 314.50, 201.56-201.57, 1.21, 201.80 and 314.80-81.

94.     From 2003 through the present, Defendants breached their duty of care to Ms. Cook's prescribing physician because they failed to conduct adequate premarketing and post market safety surveillance of Nexplanon and failed to report all of the significant safety and efficacy data regarding the adequacy of its warnings.

95.     From 2003 through the present, Defendants also breached their duty of care to Plaintiff's prescribing physician and Plaintiffs because they failed to adequately assess and review all pre- and post-approval adverse events (both before approval and after approval of Nexplanon) and to report, disclose and inform prescribers about this safety information bearing upon the adequacy of its label.

96.     From 2011 to the present, Defendants breached their duty of care to Plaintiff's prescribing physician and Plaintiffs because Defendants failed to periodically review all post-approval medical/scientific literature and failed to report significant data concerning safety information that significantly impacted on the efficacy and safety of Nexplanon.

97.     Defendants knew or should have known through the exercise of reasonable care, that the package insert and label for Nexplanon failed to state the relative risks and degree of risks of severe side effects associated with Nexplanon, including but not limited to the increased risks of VTEs, DVTs, pulmonary embolus, strokes, heart attacks and fatalities, including in the obese and African American subpopulations.

98.     At all material times, Defendants were engaged in the business of manufacturing, marketing, distributing, promoting, and selling Nexplanon. Defendants, from 2011 through the present, deliberately and intentionally misrepresented to, and omitted and/or concealed material facts from Plaintiff's prescribing physician, including in misrepresenting that Defendants' product Nexplanon was safe when used as intended, when in fact the drug product is more dangerous than

safer alternative contraceptive therapies with respect to the increased risks of VTEs, DVT, pulmonary embolus, strokes, heart attacks, and fatalities, especially in obese and African-American women.

99.     Defendants concealed facts known to them in order to ensure increased sales of Nexplanon, without providing all of the essential scientific information for the safe and effective use of the product through applications and supplements filed to the FDA, DHCP letters, press releases, patient information leaflets, medication guides, promotional materials or through other risk communication mediums that are used by drug makers to inform the medical community, including Plaintiff's prescribing physician Dr. Hurt.

100.    Defendants had a duty to disclose the foregoing increased risks to Dr. Hurt and knowingly failed to do so. Defendants' representations that Nexplanon was safe for its intended purpose were false and misleading, given Nexplanon was in fact dangerous, especially to obese and African-American females with respect to the increased risks of VTEs, DVTs, pulmonary embolus, strokes, heart attacks, and fatalities.

101.    Ms. Cook's prescribing physician and Plaintiffs were not aware of the falsity of the foregoing representations or aware that material facts concerning the safety of Nexplanon had been concealed or omitted.  In reliance upon Defendants' misrepresentations, Plaintiff was prescribed Nexplanon by Dr. Hurt.  Had Plaintiff's prescribing physician known the true facts concerning the risks associated with Nexplanon, Plaintiff would not have had it prescribed or implanted.  The reliance by Plaintiff's prescribing physician upon Defendants' misrepresentations was justified because misrepresentations and omissions were made by individuals and entities that were in a position to know the true facts concerning Nexplanon - specifically, upon information and belief, Merck's Global Marketing Director of Women's Health & Fertility Rob Mitchell, Associate Vice

President and Therapeutic Area Lead of Clinical Safety and Risk Management Ann Straus, Senior Director of Clinical Safety and Risk Management Sharon Rudo, Organon's Director of Regulatory Affairs, Tonja Hampton, and Defendants' sales representatives[57] who detailed and provided Nexplanon training to Dr. Hurt were in a position to know and did know or should have known that prescribing physicians like Dr. Hurt would rely on Defendants' misrepresentations in the Nexplanon labeling and marketing materials. The reliance by Dr. Hurt is also justified because Defendants know and expect prescribing physicians to rely on the accuracy of Defendants' Nexplanon label and promotional material.

102.    Plaintiff's prescribing physician and Plaintiffs were not in a position to know the true facts because Defendants aggressively promoted the use of Nexplanon and concealed the risks associated with its use, thereby inducing Plaintiff's prescribing physician to prescribe Nexplanon.

103.    As a direct and proximate result of Defendants' misrepresentations and concealment, Ms. Cook was prescribed Nexplanon, died from her use of Nexplanon, and Plaintiffs suffered injury and harm as alleged herein.

104.    Defendants' conduct in concealing material facts and making the foregoing misrepresentations, as alleged herein, was committed with conscious or reckless disregard of the rights and safety of consumers such as the injured Plaintiffs, thereby entitling Plaintiffs to punitive damages in an amount appropriate to punish Defendants and deter them from similar conduct in the future.  Plaintiffs do not allege a claim or cause of action for fraud on the FDA.

## COUNT III - NEGLIGENCE

105.    Plaintiffs incorporate by reference each and every paragraph of the Complaint as though set forth in full herein.

---

[57] Plaintiffs anticipate that discovery will reveal the identities of additional individuals who participated in the fraudulent conduct.

106.     Defendants owed a duty to Plaintiff's prescribing physicians and Plaintiffs to use reasonable care in testing, labeling, manufacturing, marketing, supplying, distributing and selling Nexplanon, including a duty to ensure that Nexplanon did not cause users to suffer from unreasonable, and dangerous side effects. Further, Defendants at a minimum had a duty to conduct safety reviews of all pre-approval clinical trial data, pharmacology and toxicology data, including published scientific literature, especially involving the increased risks to obese and African-American females, and to conduct adequate post-approval review of safety data, especially involving the increased risks to obese and African-American females, including reviewing the post-marketing clinical studies, published literature, and global spontaneous reporting regarding the increased risks of VTEs, including DVTs, pulmonary embolus, strokes, heart attacks, and fatalities associated with Nexplanon, and to update the Nexplanon labeling with the essential scientific information for the safe and effective use of the drug.

107.     Defendants failed to exercise reasonable care and failed to warn of the known risks associated with the risks of Nexplanon, including the increased risks, incidences and frequencies of VTEs, including DVTs, pulmonary embolus, strokes, heart attacks, and fatalities, especially in obese and African-American females.

108.     Nexplanon lacked sufficient warnings regarding the hazards and dangers to users of Nexplanon and failed to provide safeguards to prevent the injuries sustained by Ms. Cook and her mother, including inadequate warnings regarding the increased risks, incidences and frequencies of VTEs, including DVTs, pulmonary embolus, strokes, heart attacks, and fatalities, especially in obese and African-American females.

109.     From 2003 through the present, Defendants failed to properly test, analyze and report on the safety profile of Nexplanon prior to its sale, and as a result, subjected users to an

unreasonable risk of injury when those products were used as directed, and breached their duty to conduct safety reviews of all pre-approval clinical trial data, pharmacology and toxicology data, including published scientific literature, especially involving the increased risks to obese and African-American females and to update their labeling with the essential scientific information for the safe and effective use of the drug in a manner that was accurate, and not false or misleading.

110.    In addition to those reasons set forth above, Defendants from 2003 through the present, breached their respective duties and each were negligent in its actions, misrepresentations, and omissions towards Plaintiffs in the following ways:

a.    Failed to exercise due care in developing, testing, marketing labeling and manufacturing Nexplanon;

b.    Failed to include adequate directions for use and warnings with Nexplanon to alert prescribers of its risks and side effects;

c.    Failed to adequately and properly test Nexplanon before placing it on the market;

d.    Failed to conduct sufficient clinical testing on Nexplanon;

e.    Failed to adequately warn Plaintiff and Plaintiff's prescribing physicians regarding the increased risks of VTEs, DVTs, pulmonary embolus, strokes, heart attacks, and fatalities associated with Nexplanon, especially in obese and African-American females;

f.    Failed to conduct adequate pharmacovigilance and prepare a risk management assessment and pharmacovigilance plan to mitigate the increased risks of VTEs, including DVTs, pulmonary embolus, strokes, heart attacks, and fatalities associated with Nexplanon, especially in obese and African-American females;

g.    Failed to warn through various communication vehicles, including patient information leaflets or patient medication guides, Dear Healthcare Provider letters, press releases, and other risk communications;

h.    Failed to provide adequate post-marketing warning or instructions after Defendants knew or should have known of the significant risks identified herein;

i.    Placed an unsafe product into the stream of commerce; and

j.    Were otherwise careless or negligent.

111.    From 2003 through the present, Defendants knew or should have known that Nexplanon caused unreasonably dangerous risks and serious side effects of which Plaintiff's prescribing physician would not be aware. Defendants nevertheless advertised, marketed, sold, and distributed Nexplanon, despite knowing of its unreasonable risks of injury.

112.    Defendants knew or should have known that consumers such as Ms. Cook would suffer injury as a result of Defendants' failure to exercise reasonable care as described above.

113.    Defendants knew or should have known of the defective nature of Nexplanon, as set forth herein, but continued to manufacture, market, and sell Nexplanon so as to maximize sales and profits at the expense of the health and safety of the public, in conscious disregard of the foreseeable harm caused by the drug.

114.    Defendants failed to disclose to Plaintiff's prescribing physician facts known or available to Defendants in order to ensure continued and increased sales of Nexplanon. The failure to disclose this critical safety information to Plaintiff's prescribing physician deprived him and Ms. Cook of the information necessary for Ms. Cook and Plaintiff's prescribing physician to weigh the true risks of taking Nexplanon against the benefits.

115.    As a direct and proximate result of Defendants' negligence, Plaintiffs suffered harm for which the imposition of punitive damages against Defendants is warranted.

## COUNT IV - GROSS NEGLIGENCE

116.    Plaintiffs incorporate by reference each and every paragraph of this complaint as though set forth in full herein.

117.    Defendants had the duty to exercise reasonable care in testing, manufacturing, marketing, labeling, selling, and/or distributing Nexplanon, including a duty to ensure that Nexplanon did not cause users to suffer from unreasonable and dangerous side effects.

118.     Defendants failed to exercise reasonable or even use slight care in testing, manufacturing, marketing, labeling, selling, and/or distributing Nexplanon for the reasons set forth above. Defendants failed to properly test, analyze and report on the safety profile of Nexplanon prior to and after its original sale, and as a result, subjected users to an unreasonable risk of injury when those products were used as directed, and breached their duty to conduct safety reviews of all pre-approval clinical trial data, pharmacology and toxicology data, including published scientific literature, especially involving the increased risks to obese and African-American females, and to conduct adequate post-approval review of safety data, especially involving the increased risks to obese and African-American females.

119.     As a direct and proximate result of the Defendants' sale, marketing and distribution of Nexplanon without adequate warnings, Ms. Cook lost her life and Plaintiffs suffered harm as alleged herein. As a direct result of Defendants' gross negligence, willful and wanton misconduct, and other wrongdoing and actions, which constitute a deliberate act or omission with knowledge of a high degree of probability of harm and reckless indifference to the consequences, Ms. Cook and Plaintiffs sustained the damages alleged herein. In light of the surrounding circumstances, Defendants knew or should have known that their conduct would naturally or probably result in injury or damage, and they continued the conduct with malice or with reckless disregard of the consequences. The aforementioned conduct was committed with knowing, conscious and/or deliberate disregard for the rights and safety of consumers such as Plaintiffs, thereby entitling Plaintiffs to punitive damages in an amount appropriate to punish Defendants and deter Defendants from similar conduct in the future.

## DEMAND FOR JURY TRIAL

120.     Plaintiffs demand a jury trial on all counts in this Complaint.

Plaintiffs' Original Complaint                                                                      Page 40

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment and relief as follows:

1.    Actual and compensatory damages, including but not limited to past and future medical costs;

2.    Loss of consortium, companionship and society;

3.    Restitutionary relief and pecuniary loss;

4.    Past and future non-economic damages, including but not limited to survival damages, wrongful death damages, past and future pain and suffering and mental anguish;

5.    Loss of life damages;

6.    Funeral and burial expenses;

7.    Conscious pain and suffering;

8.    Economic/Pecuniary damages, both in the past and future, including lost earnings; and

9.    Punitive and exemplary damages.

Plaintiffs request all other and further relief to which they are entitled at law and equity.

DATED:   November 19, 2021